Case number 22-1148, GPA Midstream Association and American Petroleum Institute Petitioners v. United States Department of Transportation and Flightline and Hazardous Materials Safety Administration. Mr. Cole for the petitioners, Ms. Mohan for the respondents. Good morning, your honors. May it please the court. My name is Keith Coyle and I'm appearing on behalf of the petitioners, GPA Midstream Association and the American Petroleum Institute. I would like to reserve 2 minutes for rebuttal. Public safety is never served by failing to follow the law. And respondents failed to follow the law in 2 fundamental respects. First, respondents acted contrary to law. In 2012, Congress added a specific rulemaking provision to the pipeline safety act regarding the use of rupture mitigation belts. And Congress limited that provision to transmission pipeline facilities. Gathering pipeline facilities are not transmission pipeline facilities. And respondents cannot use their general rulemaking authority to say otherwise. Second, respondents fail to comply with the procedural requirements in the pipeline safety act. Respondents fail to prepare an adequate risk assessment, deprive the pipeline advisory committees of the opportunity to perform their peer review function, and fail to engage in reasoned decision making. For these reasons, petitioners are respectfully requesting that the court vacate the rupture mitigation valve requirements for gathering lines in the final rule. I welcome the court's questions. In your brief, I think you said vacate and sever. Is that right? Yes, sever the rupture mitigation valve requirements for gathering lines from the remainder. Sever them where? From what? I think the way that would have to work is the court would have to declare that the rupture mitigation valve requirements for gathering lines were unlawfully promulgated and then send the matter back to the agency to make appropriate changes to the rule in a subsequent process. So really just a declaratory judgment? That's correct, yes. Although I'm not sure why a remand? Obviously if the court were to declare those null and void, then by operation of law, I guess the agency could leave the rules on the books. They can always do it again. There's nothing, unlike most cases, there's nothing in the record that can just be massaged or supplemented. There's nothing, basically. I think that's correct. We think that the agency, if you look at the key technical study that formed the found basis for this entire rulemaking, the 2012 study by Oak Ridge, the agency didn't consider gathering lines at all. And then eight years later, when they issued the proposed rule, preliminary regulatory impact analysis and draft environmental assessment, no references to gathering lines at all. You're not doubting that they have the authority to regulate the gathering lines, are you? I'm not, in the general sense. I think what I am saying... In the specific sense of rupture? I think the way that the statute is intended to operate is the agency needs to address the specific mandate in subsection N first. I think they can do that in either two ways. I think they can issue a final rule, as they did here, that applies rupture mitigation requirements to gathering lines. Or I think the agency could have relied on the if appropriate clause in subsection N. If they had looked at the data that came back from Oak Ridge, say they'd done a study of all pipelines, not just transmission. Data comes back from Oak Ridge. Agency looks at the general rulemaking factors and says, we think this is more appropriate to be handled under our general rulemaking authority. I think they could have done that, but I don't think they did it here. I think the agency just proceeded under subsection N. And then I think essentially at the 11th hour, they tried to bring gathering lines into this rulemaking process without any adequate legal foundation for doing so. So the notice of proposed rulemaking was deficient as far as you're concerned. There's no natural out. Is that the heart of your argument? Because they certainly have the authority. Right. Yes, sir. I'm not making a logical outgrowth argument in the sense that the rulemaking language that they proposed couldn't apply to gathering. We knew that when we submitted comments, we said to the agency, wait a minute. You guys just put real text on the books that if you read it through the cross referencing, it could apply to our clients. But there's nothing else in the record to show that's what you meant to do. The study that you commissioned didn't mention gathering lines. Nothing else in that rulemaking proposal mentions gathering lines. Wait, wait. What are you saying on natural outgrowth? It is or is not a natural outgrowth. The notice of proposed rulemaking either gave, provided an actual, the end rule was either a natural outgrowth of that notice of proposed rulemaking or not. So just to clarify, we're not saying that the rule text that the agency put on the books couldn't have been applied to gathering. We knew that. We can see that. What we're saying is everything else that goes into the rulemaking process that the agency was supposed to do, they didn't do in developing that rule. And they didn't cure it after they issued the proposed rule. They presented the rule to the pipeline advisory committees without the adequate supporting. So you're saying, I'm just trying to understand your theory. You're saying that, yeah, maybe there was notice in a minimal way, but in proceeding with the rulemaking, they did not then create a record that would support the regulation of gathering law. That's your argument. I think that's correct. And also we did. I think that's correct. No, I really need to understand. I want to know what your theory is. My theory is this, Your Honor, just to clarify. Even if the proposed rule text that was in the NPRM could be read as applying to gathering, there was nothing else that the agency did up to that point to support the proposal. No, no, wait. I'd rather say it my way just so that I can think this through. You're saying that you're not going to go natural outgrowth. So we would lose if we went that way. I think that's correct. Okay. What we are saying is, okay, we have some notice that maybe gathering could be involved, but they never supported it during the course of the rulemaking with a record that would support the regulation of gathering. Is that what you're saying? Yes. You said that much better than I do. I don't know if it's better, but at least I understood it. That was the point I was trying to make. If we're talking about did the language give us notice? Yes. And we knew that because we submitted comments saying, wait a minute, this language could apply to us. And we also said nothing else in this rule suggests you want to apply this to gathering. You don't have a technical foundation. You didn't do a cost analysis. This is not about agency authority. It's about agency did not exercise its authority in the way that could reach gathering. If you think on the agency authority question, we're also making this argument, which is in order for the agency to apply these rupture mitigation requirements to gathering, they needed to satisfy subsection and first. And there were two ways they could do that. It could issue a final rule that included just requirements for transmission lines and rupture mitigation. Or if they wanted to exercise that, if appropriate clause in the specific subsection, and they could have made that finding that would have been final agency action. It had been subject to review. It would have had discretion and they would put the world on notice. Hey, look, we're going to use our general rulemaking authority here. Everything's on the table. We're not also not disputing now that they issued the regulations required by subsection. I think they can use their general rulemaking authority tomorrow to go out and do a rule. We think that that is a one and done rulemaking provision. Once the terms are satisfied, the agency can exercise whatever legal authorities are appropriate. We just think they had to follow the process and that they didn't follow the process here. But our specific gathering lines similar to the transmission lines. It depends on the question that you're asking. Like, are there do certain gathering lines share the same risk profiles transmission? Yes. Certain distribution lines share the same risk profile as transmission lines as well. That's sort of asking and answering the wrong question from our perspective. Congress wanted the agency to look at the economic feasibility, operational feasibility, technical feasibility. And those aren't generalized questions about. Are there comparable risks? They would have written this a different statute. If that was what they asked to look at was, is it feasible? Is it technical? Is it economic? And that's why they commissioned this study back in 2012 was to give them the data on that question that they needed to make a judgment about how to proceed with the rulemaking. And again, there was no analysis of gathering lines in that study, which my perspective, that is the foundational study that they're using for this rule. And there's no mention of gathering lines. I read the objections that were the points that you're making about what's missing. They all may be wrong about this. They seem to go all to the economic feasibility, not operation. So I don't know that that's that's that's not correct. I mean, at this point, the record doesn't really we don't have a record on some of these operational and technical issues because the agency never looked at it. But we do point out some of the economic concerns. We also have very significant. Did you just agree with me then or not? Yes, definitely. We have concerns on the economic issues. I don't think I would give me an example of operational concern that's mentioned in your brief. Sure. So the way that this final rule applies, it applies on a very segmented basis. We provided some evidence on that in our declaration. So you can have very short segments of regulated gathering lines. The shortest twenty six feet that need to be protected by these these rupture mitigation valves. And then you can have long spaces in between. Gathering lines operationally are very different than transmission. They vary significantly in diameter. They're pulling oil and gas off of various production wells. Flows can change. Pressures can change the product that they're transporting is not purity. I don't remember that in the product that they're transporting could be variable. Yes. Mentioned in the brief. These issues. I think our point on this is these are issues that the agency needs to look at before they do a final. And they haven't done that. Well, as you said, your declarations deal with the it looks to me like the economic point because of the segmentation. So one of the declarations lists eight or nine lengths of a single in a single pipeline, which when added up together to one point or two months, there would be nine valves, a space of one. It seems to me to support a claim that their figures on cost are totally unrelated to reality. Doesn't tell me anything about operations. Yeah, I think on the operational side, one of the other points that we make is so on valve usage rates and the agency's final regulatory impact analysis, they assume the gathering line operators use these rupture mitigation valves at the same rates as transmission line operators. There's no support for that. And one of the reasons that we see more deployment of rupture mitigation on transmission, because the agency has required those valves to be considered since the 2000s. So we have 20 years of experience under the rules. Agency didn't account for that in the final analysis. You mean transmission side? Transmission side. Correct. So on the gathering side. And look, if you go through the final analysis, you won't find a single project involving a gathering line. The only focus on projects involving transmission lines. A lot of them are transmission lines regulated by the Federal Energy Regulatory Commission. Those are regulated as public utilities for economic purposes. We are not. Gathering lines are generally not subject to public utility regulation. So there's a different cost recovery structure. The regulated lines were excluded. I'm sorry? Were the regulated lines excluded from the coverage of the rule? Certain regulated gathering lines were brought into this rule. Some were. Yeah. But again, there's no analysis of how are these provisions going to affect this very different sector of the industry. And there are hundreds of thousands of miles of gathering lines. Same as there are transmission lines. Historically subject to different regulation by PHMSA. Historically subject to different economic regulation. And we have no consideration of those issues in the final regulatory analysis. Together there are differences regarding stress levels. Operationally, there can be distinctions. So, in some respects, and I think you'll probably hear this from the department, you know, a pipe's a pipe. A pipe feels stress the same way, whether you call it a gathering line or you call it a transmission line. That's good as far as it goes. But I think operationally, some of the things that we talked about in terms of where they are in the sector, pulling in product from different wells. Different quality types of gas. There may be sediment. There may be water. All of these issues affect the operation of gathering lines in ways that don't affect the operation of transmission lines. But do they affect stress? I'm sorry? Are you raising them because they do affect stress levels? No, rupture mitigation valves do not affect the operating stress levels. No, no, the variability of the product. I'm raising that just in the sense of the operational challenges that come along with operating a gathering line. You have to think about different things when you're running a gathering line than you do when you're running a transmission line. There are differences in products and pressures, where you're getting the oil and gas from. Okay, well, I understand the relevance of pressure. I understand the relevance of product. Maybe it doesn't matter. Yeah, I think there would be operational challenges with the operation of certain types of equipment. When you have water, hydrocarbon liquids, other things in the gas stream or in the oil stream, it might present challenges to operating certain types of equipment. The other thing I'll note is, again, on these automated valves, transmission has had this role for a long time, and they're supposed to look at it. So they have evolved control rooms that can operate these valves. We don't think that that same analysis would apply to the gathering sector. They have a very different set of players. Some can be very small. Some can be very large companies. But it's a big difference in terms of how the sector operates. Why did the advisory committee think there should be a separate rulemaking for gathering? I think the advisory committee felt like we felt, that the agency had brought a proposal before it that was inadequately developed. And by statute, the advisory committee is not just supposed to look at the proposed rule text. They're supposed to look at the preliminary regulatory impact analysis. Well, one difference is that they thought there was a lack of notice, and you're not complaining about that. Not in the sense of, again, just to be absolutely clear, not in the sense of the actual text of the proposal they put on the table. We knew that those regs could be read as applying to us. We didn't have notice of anything. Now, of course, there may be, I mean, they're talking perhaps about public, I mean, the public beyond the industry. I think that's correct. Or more in, they're not lawyers, more in a general sense. Like, this is not a developed record. That's the way. Well, yes, they also said to get supporting data, which obviously was lacking. Yeah. And if you're going to present a proposal to us, they take their jobs very seriously. This is not just their five industry members, five government, five public. This wasn't a close call. This was unanimous across the board. There's a public notice. And I think they felt like that this was not an adequately developed proposal for them to be asked to decide. So what did they estimate the number of RVs per year? I don't recall exactly what the agency estimated in terms of impact in the final regulatory impact analysis in terms of there would be two forms of impact. One would be new pipelines. You know, if you're subject to the rule, you've got to build. And then they have this two miles out of five miles replacement rule. You have problems with that language. We didn't really press it too hard in the brief, but Congress said new or entirely replaced transmission lines. We think two miles out of five miles over a two year period is a partial replacement. We don't think that's consistent with the statute, but we're not really pressing that. Didn't you didn't you raise. You knew that proposed rule could cover the language. Yes. And so most people, most lawyers and companies are going to be covered that way. In anticipation, that possibility will offer up their concern. In response to the roommate, did you offer the same concerns you're raising now? Absolutely. And did the agency respond? We don't believe they responded adequately to our concerns. We identified the issues with a statutory basis for the rulemaking. We forget the statutory basis. We already said there is a statute on the procedural issues we've raised. So you said you didn't study this in the Oak Ridge technical study. No mention of gathering lines. Nothing in the proposed rule in terms of analysis or explanation. Nothing in the regulatory impact analysis. Again, this is where we see is very important is the agency is representing to you that they always knew that this rule was going to apply to gathering. If they knew that, why didn't they ask Oak Ridge to look at gathering? No, no way. I want to come out a little bit different. I'm going to say what you're saying. You say you knew you were concerned about that. There's no surprise to you in terms of the real text. So what was it? Since you knew it could cover gathering. What was it you raised that was significantly important during the rulemaking that they failed to answer? What are you focusing on? Don't give me general. What in particular? Knowing gathering is likely going to be covered. What did you raise? They did not respond. The absence of consideration of gathering lines in the 2012 rupture mitigation valve study by Oak Ridge. That was the foundational study for the rupture mitigation valve requirements. They did not consider gathering lines at all. The agency never addressed that issue adequately in the rulemaking process. In the preliminary regulatory impact analysis, no analysis of gathering lines at all in terms of what the statute demands or requires. And they still presented all that information to the advisory committee for a vote. If they're right, and they could have done this under their general rulemaking authority, they could have stopped at that point. It could have realized that they didn't have the information they needed to present to the advisory committee, and they could have supplemented the record. And they didn't do that. They presented a proposal to the advisory committee. They asked them for a vote, and the advisory committee said, there's a public notice problem here, because there's not a sufficient basis in the record to move forward on this rule. And we don't think that the agency cured any of those defects at the final rule phase of the proceeding. So the foundational study didn't cover them, and the impact analysis, those are your two concerns. You said you raised them, and they didn't respond. That's correct. They did not adequately respond to those concerns. Anything else that you significantly raised that was not responded to by the agency? Yes, sir. We think the agency failed to comply with the pipeline advisory committee requirements themselves. They presented an inadequate proposal for review. There was a statutory requirement that they need to respond to significant comments within 90 days. The agency did not do that. They said in their brief that they've never done that. They're not required to do it. And even if they didn't, it's harmless. And we think Congress put that 90-day requirement in there so that the record would be developed contemporaneously with the rulemaking process. So we'd be having, you know, a discussion today based on what's in the record and not necessarily based on what's being represented appropriately. I think if I understand putting out 36 at 848 correctly, the agency is anticipating that there will be one RMB required each year under the rule. And that might be what the agency put on a regulatory impact analysis. We didn't have an opportunity to review and comment. Right. I mean, that's so far off of what the declarations show. Yeah. Were those declarations submitted only in court or were they before the agency? No, these were just submitted for purposes of our declarations of standing. But we did raise the issue with respect to segmentation. It was raised both in our comments. Members of the advisory committees themselves raised the issue about concerns with applying this kind of requirement to partially regulated, widely dispersed segments. Thank you. Thank you. We have placed the court, Anna Moen, on behalf of the U.S. Department of Transportation and the Pipeline and Hazardous Materials Safety Administration. Your Honor, I want to take a step back in response to some of the questions that petitioners addressed and just rebut the notion that gathering lines and transmission lines are these fundamentally different types of pipelines. Originally, when Congress first enacted the pipeline safety laws in the 1960s and 70s, gathering lines and transmission lines were quite different. Gathering lines typically only went through very rural areas. They tended to be smaller in diameter and they tended to operate at much lower pressures and so didn't necessarily present the same risks that transmission lines did. But what happened over the course of time, the population changed, the methods of extraction changed, and in the early 2000s, the agency recognized that now certain subsets of gathering lines had the same risk profiles as transmission lines. They passed through similarly populated areas. They had equally large diameters. They operated at equally high pressures and thus presented the same risks if they were to rupture. Is that what the notice of proposed rulemaking said? We want everyone to understand we're taking transmission and gathering as being essentially the same because over time things have changed. Is that what the notice said? Your Honor, the notice in this particular rulemaking did not say that. Okay, so that is one answer to you, at least the way we normally look at agency rulemakings. You didn't attend to something that you're now saying is fundamental. You didn't say we're moving on a premise which is that gathering and transmission are essentially the same because things have changed. Okay, what's your next point? My next point, Your Honor, is that I think this is a unique regulatory history here because you have the regulations in the early, mid-2000s that went into, the agency was specifically directed to consider what should be a regulated gathering line based on its operational characteristics. And there, the agency did a very thorough rulemaking where it decided, as a default, certain subsets of these gathering lines are going to be subject to the same rules as transmission lines because of the risks that they present. I don't understand the petitioner's disagreeing with anything that you just said. I'm not sure why we're hearing it. Your Honor, I was simply emphasizing the history, which shows that it is appropriate. Okay, we understand that they're now operating in a different environment or less rural and so on. That doesn't make them operationally similar. In fact, you didn't say it did. You say it creates a similar risk profile, which is true with regard to population density and so on, but not necessarily with regard to operations or economics. Your Honor, in terms of operational characteristics, I think that's where factors like diameter and operating pressure come in, and those are similar as to these subsets of gathering lines. I think there's a lot of question raised and not addressed about the similarity of the stress factors. I think what we see is that some gathering pipelines have stress level that could be as high as that of transmission lines, but no information at all about the distribution of frequency of such things. There could be outliers. We don't know, and I think you don't know. Your Honor, I would just say the way that type A, so taking gas as an example, the way type A gas gathering lines are defined is that they have operating pressures of greater than 20%. Exactly, which is what transmission lines are greater than 20% could be 90% or 30%, right? It could be, but I can give you a graphic on this if you want me to hold it up. It's pretty easy to see that the overlap between two normal distribution curves may be quite modest. It's like a Venn diagram. Your Honor, I'm not sure about the specifics of the diagram, but I think my only point was that transmission lines tend to operate at that 20% or higher threshold, and so do this subset of gathering lines. But that doesn't make them similar. It does, and so I guess there are... I have a lovely, homely example that my book. He and LeBron James are both over six feet, so they're similar, right? In no important respect are they similar. It's just statistically true that they're both over six feet, and one is not qualified to play in the NBA as a result of being over six feet. So if the transmission lines are operating at more than 20%, that pressure statistics, and the, pardon me, the gathering lines are, and the transmission lines are at 80%, they're not really similar. Your Honor, I think that when the agency conducted these rulemakings in the early 2000s where it defined these subsets of pipelines, it examined the characteristics that are important in terms of thinking of similarity of risk profiles. And one of them was stress level. Yes, but that is how... ...on close inspection that they are similar in that respect, that everyone's operating roughly at 25%, right? But we don't know that, and the petitioners have pointed that out. Your Honor, I think we know that... They weren't important. The gathering was important in the foundational study, right? Your Honor, what the Oak Ridge study did was it examined hypothetical pipelines of different diameters... And not gathering. ...and different pressures. Well, it was just looking at sort of a generic pipeline of different pressures and different diameters, and it examined the potential consequences of rupture. Well, but it said it was looking at generic transmission lines, right? So we don't know whether that means that's just as good as looking at gathering lines. And the impact analysis did not include gathering, right? The preliminary risk assessment lacked mileage data on gathering lines, which the agency added as a part of the final assessment. It did have incident report data from gathering lines, and the Kueffner study went into examination of incidents and ruptures on gathering lines. And the advisory committee said, we don't know what you're talking about on gathering, right? Your Honor... Yeah, think about what we're looking at as a court. I mean, it's very strange when an agency gets alerts of the sort that the agency had over so many years, and they ignore them. Because it's so simple for the agency to say, okay, let's do a supplemental. These people are getting all agitated about gathering. We definitely have the authority to cover gathering. We're going to do it. What do you need? We'll give it to you now. I couldn't comprehend it when I prepared this case, why the agency wouldn't have fixed a very obvious problem. Your Honor, I think the agency made a reasonable decision to incorporate gathering lines within this rulemaking, based on the conclusions that it reached about the similar risk profiles of different pipelines. And really, it's understanding that Congress was incredibly focused on pipeline safety, was focused on these incidents where there was evidence that rupture mitigation valves would have reduced the consequences. And those were transmission lines. The San Bruno and the Kalamazoo incidents were transmission lines, but there was other incident report data from gathering lines as well. And what's the conclusion regarding safety coming out of Oak Ridge? The conclusion was that there might be site-specific factors. That's part of it. Yep, that's right. That doesn't help you. What else? I was going to say, I sort of jumped ahead in answering your question. The conclusion in terms of safety was that there can be benefits to installing these rupture mitigation valves. As long as they shut down within 10 minutes. And the agency said, well, OK, shut down within 30 minutes. No evidence whatsoever that that will mitigate anything. Your Honor, that was based on... No, there is, in one sense. There are two examples of ruptures that were not detected for well over 30 minutes, hours. Your Honor, the agency, based on comments from the public, based on engagement with the advisory committee, determined a set of rules to pair with the rupture mitigation valves that it thought would... But if the rupture mitigation valves can't, start from Oak Ridge, at least as far as Oak Ridge is concerned, can't do a measurable good unless they shut down within 10 minutes, it just isn't support for the agency's conclusion. Your Honor, I don't understand petitioners to be arguing that as a general matter, the Oak Ridge study doesn't support the idea that rupture mitigation valves can have benefits. I just want to... No, no, it can have benefits. No, no, that's not... No, no, we're with you there. That's not the problem. As Judge Ginsburg was saying, it's much more specific than that. You're not giving support for the inclusion of the gathering. It's just not there. Your Honor, I just want to address the cost piece very quickly. I realize I have 13 seconds left, but if Your Honors will permit me. Certainly. I want to point out that the agency did address these potential for cost-specific considerations by expressly allowing for an exemption where an installation of one of these valves would be operationally, economically, or technically infeasible, and it explained that in the final rule at JA-931. As to the segmentation issue, as Your Honor noted, these declarations were not in the record, but I just point out, too, that the final rule doesn't say there has to be a valve around each of those small segments. It allows for multiple segments within... Multiple segments can occur within the maximum spacing for the valves. Which is what? Well, it depends on the class location, but I believe it's 8 miles for Class 4 locations, 15 miles for Class 3 locations, 20 miles. When was the rule issued? In April of 2022. When did the Congress pass that statute about taking back money? That was in March of 2002. It was signed into law. 2002? I'm sorry, 2022, Your Honor. A few months before the final rule. That's right, Your Honor. So had the final rule not dealt with gathering pipelines and simply started over with another NPRM and gathering data, it would have lost some appropriations. It could have. I don't think so, Your Honor, because the agency could have issued the transmission line portion of the rule and complied with the mandate there. And what was the rush? There wasn't a rush, Your Honor. I think the agency... Oh, the agency said that would just entail further delay. They wanted to avoid... Maybe not a rush. Why is it so important to avoid delay? Your Honor, I think it was important to avoid delay because it's, you know, fundamental concerns about pipeline safety and the incidents that can occur on these pipelines. By the way, what did you do by way of quantifying benefits? Sorry, Your Honor, I missed it. What did the agency do about quantifying the benefits of this rule? The costs were not well quantified. What about the benefits? So the agency had its technical studies, but it did say that it was difficult to quantify the benefits of the rule. Why? Because there are a lot of qualitative benefits. For example, when a gas pipeline ruptures, there's methane gas released into the atmosphere that can cause environmental damage. The Oak Ridge study, for example, had a difficult... It didn't contend with the cost of injuries or casualties that might be difficult to quantify. So you think those things are unquantifiable? The EPA is in here every month with their quantification of benefits and costs. They're pretty sophisticated. Over the years, they've been quite good at it, actually. Doing exactly what your agency said was impossible. Your Honor, I think generally agencies have some discretion to determine how to analyze costs and benefits as a part of a risk assessment. Not to say there are benefits, but they are personal injuries, property damage, things that we can't quantify as a non sequitur. Because those are things that can be quantified, if not by this agency, then by fellow agency in the government. Your Honor, I think... I don't know how you got this bio. I really must be asleep at this point. I can't speak to that, Your Honor. I'm sorry. I would just say the agency did a thorough analysis here of the studies and the reasonably available information it had and ultimately concluded... Not to pursue any more. So this is enough. It believed the benefits of the rule justified its cost. If petitioners at least somewhat agreed that the specific gathering lines are similar to the transmission lines, what do you feel like they were on notice about such that they had an adequate opportunity to comment? Your Honor, I think they were on notice, as I understand petitioners to be conceding today, that the rule would apply to gathering lines. Their comments following the Notice of Proposed Rule specifically say this rule would apply to gathering lines on JA 317. And they also had opportunities, both at the committee meetings and following the committee meetings, to submit additional comments on the application to gather lines. Do you feel that you all responded to all of their comments? Because that's one of the contentions that he's making. Yes, Your Honor. We believe that the agency responded thoroughly to all of the comments. It responded to the notice piece of the committee recommendation. And I'd just like to clarify that the committee didn't say, you know, we have decided that there was inadequate notice here, and we are not going to recommend that the agency go forward with this rulemaking. They said they were going to leave it to the agency to evaluate the notice question and decide whether it felt that it should proceed. And the agency addressed that in pages JA 924, 925, and 936, 937, the final rule. It addressed the idea of excluding gathering lines and included the explanations that I've included. Did it say anything specific about segmentation? Your Honor, it didn't use the word segmentation. That's okay. Did it say anything about it? We believe the agency addressed that concern by including the site-specific exemption requirement. But also, I'd just point out that transmission lines are also regulated on a segmented basis. That's through the nature of the agency's risk-based approach to pipeline regulation, is that all types of lines are subject to different regulations depending on the risks that they present. I'm sorry. All or each? Both transmission lines and gathering lines can be regulated differently, subject to different regulations depending on, for example, the locations they pass through. Okay, so that's specific to the location. That is one of the factors that influences how. How does that work? There's a regulation, and they want to say, this doesn't work because of the terrain. What do they do? Your Honor, in this specific situation for rupture mitigation valves, I think that's exactly one of the things that would be considered as a part of this exemption request process. So one of the things that Oak Ridge study commented on was the idea that you could have a really rural area where you might not be able to have the communications technology to allow these remote valves to work. And so that's why the agency said, okay, in those situations, the operator can let us know and we'll evaluate whether an alternate technology would be appropriate. And that can be terrain as well. In answer, I'm a little bit confused. My colleague, Charles, they were on notice that you might go after the gatherer. But they then clearly made it, and they're entitled to do this. They're challenging the record that you made, and the principle points that they're making is, I understand that you're not really able to overcome them. Gathering's not in the foundational study. The impact analysis really is not covering gathering. And the advisory committee, which the object was concerned about, said that you really haven't attended the gathering. They're different. Those are the three big things. There are pieces to it, but as parties who are entitled to appear before the rulemaking, they were saying, yeah, we know you might do this, but you know what? You're not building a record, and I don't think you've answered that one. You have bits and pieces that you're trying to point to. They essentially were saying, as I'm hearing, that this is not about gathering. And there are some things that are different about transmission and gathering, and you have to attend to them. And you don't have it in the foundational study. You don't have it in the impact analysis. You have a little of this and that, and you're trying to pick here and there, but your whole focus is on transmission, and that's a mistake. And the advisory committee agreed with them, and that's why my initial take on this is the agency made a terrible mistake. And they had plenty of opportunity to do it. Your Honor, I'd just push back on that a little bit. I think in terms of the foundational analysis, that Oak Ridge study, we believe the benefits that were described in that study based on the hypothetical pipelines, and the agency explained that the risk profiles would be similar for these type A gathering lines. In terms of the advisory committee, I would just point out that the committee wasn't unanimous. They were split. Many of the committee members expressly supported and articulated their support for applying this rule to gathering lines. And again, they left it to the agency as a part of their recommendation to decide whether to engage in a separate rulemaking. And in terms of the impact analysis and the incident, I might be misinterpreting how Your Honor is referring to impact analysis, but at least as to the incident report data, that did include gathering lines both in the preliminary report and in the study. So we believe, just to sum up, I'm well over my time. That's okay. We're not finished. I'm happy to answer further questions, Your Honor. Petitioners point to a provision in the statute requiring, I think it was some sort of writing being submitted, post-hoc writing to the committees, which wasn't done. And if I understood your answer, it was, well, we've never done that. Just to clarify our answer, Your Honor, our answer is that the agency uses the final rule as the written response to the committee. I will acknowledge. It does not seem to make it pointless to have the statutory commitment requirement. Isn't the point of reporting back to the committee so that they can have some, before you go final, some voice in the matter again? I don't think so, Your Honor, because the statute elsewhere refers to how, you know, proposed standards can evolve in response to committee recommendations, how the final risk assessment can evolve. And I think the importance of that requirement is to ensure that the secretary is addressing, you know, not just the comments from public that it received through notice and comment, but the recommendations from the committee as well. And the agency did that here in the final rule. I will, you know, acknowledge that the agency did not prepare that report within 90 days. There was some time between the committee process and the agency's final rule. And just to be transparent about that, that was our point when we were referring to the requirement of prejudice and the harmless error standard under the ADA. Regarding the 90 days. Exactly. But not regarding the, that's not your answer to no report at all. No, Your Honor. Our answer is that the final rule is the written report. Thank you. Thank you, Your Honors. Thank you. Well, why can't all of your concerns be addressed by seeking an exemption site specific as the department. Thanks for the question. I think. I would give two responses. First, the exemption process places the burden on gathering line operators to essentially do the analysis that the agency was supposed to do in the first place. So for them to do the analysis for every site. No, but basically to do the analysis of, is it economically, technically operationally feasible for gathering lines to have these agencies and do that. And then they're saying after the fact, well, if we didn't do in the rulemaking process, just get your exemption. And the other problem with that is the, but sometimes your exemption request would be based on for instance, the economics. Sure. Sure. Sure. And the other issue with that is the agency can object. So there's no guarantee. Like my client's not having had the process on the front end. We're being subject to a rule that we think is arbitrary. And we don't think it's sufficient for the agency to say, but don't worry. You can come get an exemption. And then if the agency denies the exemption, we still have to comply with the arbitrary. I wanted to make one other point. I'm not to belabor it too much, but I'm on the study agency citing this study from Kiefner. That was a study on leak detection technology, not used for rupture mitigation, entirely different type of technology does not speak to rupture mitigation at all. That was the Kiefner study. Yeah. Yeah. Leak detection. Yeah. Totally different subject. And just one final point on the Oak Ridge study, you will see clearly in the study itself, it says the results of this study apply to transmission pipeline. So that is what they were looking at and they knew. Thank you, your honors for your time. Thank you.
judges: Childs, Edwards, Ginsburg